FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 MAR 22 PH 3: 37

U.S. DISTRICT COURT
N.D. OF ALABAMA

NATHAN NOLIN,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        CASE NO. CV 98-BU-1561-S
                                       )
TOWN OF SPRINGVILLE, et al.,           )
                                       )        ENTERED
        Defendants.                    )
                                                MAR 2 2 1999

## Memorandum Opinion

        This cause comes on to be heard on a motion for summary judgment filed by the defendants, the Town of Springville, Alabama ("Springville"), and Officer Christopher Isbell ("Isbell"), on February 12, 1999. In their motion, the defendants contend that the excessive force claims of the plaintiff, Nathan Nolin ("Nolin"), against Isbell are barred by the doctrine of qualified immunity and that the state law claims against Isbell are barred by state-law discretionary function immunity. The defendants further contend that Springville is not liable for any alleged constitutional violation by Isbell because there is no genuine issue of triable fact supporting the averment that Isbell utilized excessive force and because, if such a constitutional violation did occur, no triable issue of fact exists demonstrates that Isbell's actions were undertaken pursuant to a custom, policy or practice of Springville. Finally, Springville contends that it has absolute immunity from state-law claims of liability against it premised on any torts that might have been committed by Isbell. The plaintiff, in his opposition, disputes these contentions.

        Summary judgment provides the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of the proof

the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment has the initial responsibility of informing this court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. The movant's burden is not meager; it must illuminate for the court the reasons why the non-movant cannot or does not raise a genuine issue of material fact sufficient to support a trial.

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). Rule 56(e) requires the nonmoving party to "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. *Celotex*, 477 U.S. at 324; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). "Tenuous insinuation" and empty speculation based on loose construal of the evidence will not satisfy the non-movant's burden. *Cf. Mesnick v. General Elec. Co.*, 950 F.2d 816, 820 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992).

While the court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV. P. 56(c), the Rule "saddles the non-movant with the duty to 'designate' the specific facts in the record" supporting its claims. *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id. See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied*, — U.S. —, 116 S.Ct. 74 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (*citing Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## Facts

On May 10, 1997, Springville held its annual "May Day" festival, a local event, originally referred to as "Old Times Day," during which several blocks of the town's main street, United States Highway 11, were cordoned off for a community celebration. Vendors were placed along the street, selling arts, crafts and food. Children's rides lined the road. Two "stages"[1] were set up in parking lots abutting the highway, from which various musical troupes entertained the crowd. Around noon that day, a local musical act, named "Empire X," played on the stage located in the parking lot off of the highway between the Springville Café and Harrison Hardware. The group exhausted its musical retinue within forty-five minutes and, at the completion of its "set," the members of Empire X began, with the assistance of the plaintiff and some others, to remove the band's equipment from the stage.

While the plaintiff loaded the equipment into one car, one of the band members, Gary Dollar ("Dollar"), drove closer to the stage in order to ease the process of putting the equipment away. Accompanying Dollar in his car was Shawn Peede ("Peede"), another member of the band. As Nolin, returning to the stage to gather more equipment, passed Dollar's car, Dollar revved the

---

[1] Actually, each stage consisted of a flatbed truck.

automobile engine, attracting Nolin's attention. The plaintiff lifted one of his legs into the air in the gesture of a kick directed at the bumper of Dollar's car.

With mock seriousness and bravado, Peede lept out of the passenger side of the automobile and began to wrestle with Nolin. The two began an adolescent tussle, laughing the entire time. They grappled with one another for a moment, until the two lost balance and fell against the hood of Dollar's car. Close by, the boys heard a woman, Nancy Butler, snap her fingers at them and tell them to stop fooling around.    Nolin stood up, grabbed Peede's leg and pulled him off of the car. Peede fell on the pavement. The plaintiff then good-naturedly aided Peede to his feet. Both attempted to return to the business of loading the musical equipment into the cars.

Inside the Springville Café sat Isbell, along with Reserve Officer Eddie Barrett, eating lunch. Next to them was crouched the local Chief of Police, Ronald Black ("Black"). Through the morning, the three officers had been patrolling the grounds of the May Day festival, directing traffic and attempting to avert trouble. As they rested there, Betty, a waitress at the café, entered the room in which they sat, stopped, peered out the café window to where Nolin and Peede were roughhousing, and yelled "fight." The officers looked over and saw Nolin and Peede, wrestling on the hood of Dollar's car. The three leapt up and ran for the double doors leading directly into the parking lot. Finding these locked, the officers then left the café by the main door, which faced the highway.

By the time the officers had exited the building and made their way to the parking lot, the plaintiff and Peede had finished their tussle and were returning to work. Nolin was ambling back to the stage when he felt one hand take hold his left shoulder and another grasp his right wrist. Isbell, who had grabbed the plaintiff, wrenched the plaintiff's wrist behind him. Nolin did not resist. Isbell then shoved the plaintiff's face and chest into a van to his left. The officer's hand pushed Nolin's head against the van. Isbell's knee dug into the plaintiff's back. The plaintiff was made to stand spread-eagle against the van while Isbell frisked him. Isbell asked Nolin his age, to which Nolin responded that he was seventeen. Nolin's hands were then handcuffed together by Isbell. Chief of Police Black brought Peede over to the van and frisked him there. Upon asking the officers what he and Nolin had done, Isbell answered Peede that he and Nolin were under arrest for disorderly conduct.

Isbell took Nolin and, soon after, Peede, both of whom protested that they had been playing,

to a street corner and made them sit. He would hear none of their explanations. Some other youths came over to where Isbell was standing and attempted to explain that the two had been engaged in a friendly tussle. Isbell reacted hostilely, telling them all to sit on the corner next to Peede and Nolin and yelling for someone to turn off the recorded music that had been playing while the equipment of Empire X was being removed from the stage. The officer began to proselytize, calling the sitting youths "long-haired acid freaks" and troublemakers, and telling them that every time a "show like this" came to Springville he had to run it out of town. Isbell's tirade about the degeneracy of the youth continued until Captain John Goodwin, another Springville police officer, arrived in his patrol car to transport Peede and Nolin to the Ashville jail.

Once at the jail, Goodwin filled out the intake paper work for Peede and then began to fill out the same paperwork for Nolin. After determining that Nolin was a juvenile, Goodwin stopped filling out the paperwork and, after a consultation with a juvenile officer, left the plaintiff alone in a room to wait until his mother came to retrieve him. The charges of disorderly conduct were subsequently dropped.

## Contentions & Analysis

The plaintiff apparently raises both federal claims and state law claims against Officer Isbell and against Springville. In his complaint, Nolin contends that Isbell, in effectuating his arrest of Nolin, used excessive force in violation of the Fourth Amendment when he threw Nolin against the van, dug his knee into Nolin's back and over-tightly handcuffed him. This alleged constitutional violation forms the basis for the plaintiff's claims that Springville and Isbell are liable under 42 U.S.C. § 1983 for the use of the force. The plaintiff also claims that in arresting him, Isbell committed the state-law torts of assault and battery, outrage, abuse of process, false arrest and false imprisonment. In response to the plaintiff's claims brought pursuant to § 1983, the defendants contend that no constitutional violation occurred; that if such a violation occurred, Isbell is entitled to qualified immunity from suit arising out of the violation; and that Springville did not have a custom, policy or practice permitting it to be held liable for Isbell's actions in the instant case. The defendants also assert that Isbell is entitled to discretionary function immunity for alleged state-law torts committed by him and that the plaintiff fails to state a claim against Isbell in any case. On

*Page 5 of 25*

behalf of Springville, the defendants argue that town cannot be held liable for any of the torts committed by Isbell.

## I. CLAIMS BROUGHT PURSUANT TO SECTION 1983 OF TITLE 28.

The plaintiff claims that in throwing him against the van, causing bruises to his chest and head, kneeing him in the back and bruising him by placing handcuffs on him too tightly, Isbell used excessive force, violating his Fourth Amendment right against unreasonable searches and seizures. The defendants respond that, even assuming that Isbell's actions were as reported by the plaintiff, those actions were insufficiently egregious to violate the Fourth Amendment and that, even were they so egregious, Isbell is protected by qualified immunity from suit and, in the absence of a custom, policy or practice of the use of excessive force, Springville cannot be held liable for any violation by Isbell.

Prior to addressing either the issue of qualified immunity or the issue of municipal liability, it is appropriate to determine whether, in the instant case, there has been a violation of the plaintiff's Fourth Amendment rights. A finding that no constitutional violation occurred will obviate the necessity of any further examination into the sometimes contorted and mind-numbing issues of the existence of "clearly-established law" prehensible by a reasonable officer and of the presence of a "custom, policy or practice" of the municipality. *See County of Sacramento v. Lewis*, — U.S. —, —, 118 S. Ct. 1708, 1714 n.5 (1998); *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).[2] If there exists a genuine

---

[2]In *Lewis*, the Supreme Court clarified the rationale behind resolving the substantive issues in a qualified immunity case before addressing the question of whether the law was clearly established at the time of the violation:

... [T]he generally sound rule of avoiding determination of constitutional issues does not readily fit the situation presented here; when liability is claimed on the basis of a constitutional violation, even a finding of qualified immunity requires some determination about the state of constitutional law at the time the officer acted. What is more significant is that *if the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment of both officials and individuals.* An immunity determination, with nothing more, provides no clear standard, constitutional or non-constitutional.

*City of Sacramento v. Lewis*, — U.S. —, 118 S.Ct. at 1714 n.5 (emphasis added). The court is, therefore, "to determine the right before determining whether it was previously established with clarity," with the purpose of establishing clear legal standards for all future cases and conduct, to the benefit of officers, where the resolution of the constitutional issue may be in their favor, and individuals, whether qualified immunity is ultimately granted or not, where the resolution of the constitutional right is in favor of the plaintiff. *Id.*

The court is also aware of *Santamorena v. Georgia Military College*, 147 F.3d 1337, 1343 (11th Cir. 1998), in which a panel of the Eleventh Circuit Court of Appeals has apparently turned the rather clear directive in *Lewis* on its head, stating, among other rationales, that "[a]lthough a majority of the Justices did join in Justice Souter's opinion

issue of triable fact concerning a constitutional violation, the court may then turn to the issues of qualified immunity and municipal liability. *See County of Sacramento v. Lewis*, — U.S. at —, 118 S.Ct. 1714 n.5.

## A. Excessive force.

In *Screws v. United States*, 325 U.S. 91, 107 (1945), the Supreme Court held that the due process clause of the Fourteenth Amendment invested in an individual "the right to be tried by a court rather than by ordeal." The context of this assertion was a claim that local law enforcement had "arrested" a black man whom they disliked and effectuated the "arrest" through deadly, and ultimately lethal, force. *Id*. The employment of that force, the Court held, constituted punishment, employed without prior trial in court due the victim. *Id*. at 106.

From this humble origin, the various circuits began to recognize claims of excessive force, not only in those circumstances in which a victim died as a result of the inappropriately used force, *see*, *Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir. 1970), but also in those cases in which the victim was merely injured. *See, for example, Tolbert v. Bragan*, 451 F.2d 1020, 1020 (5th Cir. 1971) (holding that federal prisoner transferred to state jail to answer state charges could state a claim of excessive force where five local jailers severely beat him with blackjacks) and *Jacobs v. City of New Orleans*, 484 F.2d 24, 25 (5th Cir. 1973) (upholding the appropriateness of a $500.00 award in an excessive force claim against police, in which the plaintiff, whose involvement in a brawl with police caused him only $137.00 in medical expenses, did not lose wages and suffered no permanent injury).

Given the apparent Fourteenth Amendment origins of the prohibition against excessive force in *Screws*, it is unsurprising that, at the hands of the circuit courts, the excessive force claim evolved

---

(including footnote 5) for the Court, we cannot say that footnote 5 is doubtlessly a holding of the Court." *Id*. at n.14. The *Santamorena* court held that "(1) where the existence of a constitutional right (or duty) presents a perplexing question, (2) where the alleged right obviously was not already clearly established, and (3) where the qualified immunity determination does end the whole case[,] it remains appropriate, and sometimes preferable, to stop at the determination that the right, if any, was not clearly established." *Id*. *But see*, Wascura v. Carver, — F.3d —, —, 1999 WL 123644 at *2 (11th Cir. 1999) ("We have interlocutory appellate jurisdiction over denials of qualified immunity, and that includes the authority to decide in the interlocutory appeal whether the alleged action by the defendant officials is a violation of federal law at all, clearly established or not.").

The only way in which this court can square the two apparently conflicting pronouncements in *Lewis* and *Santamorena* is to treat the holding of *Santamorena* to allow this court *the option* to avoid a difficult constitutional question in a case in which it is obvious that no right was clearly established at the time of a defendant's actions. *See also Medeiros v. O'Connell*, 150 F.3d 164, 169 (2d Cir. 1998) (stating that the decision to examine the state of then-present constitutional law was not mandatory).

into a substantive due process right under the Fourteenth Amendment, rather than as a claim specific to a particular right listed in the first eight Amendments to the Constitution. *See Hamilton v. Chaffin*, 506 F.2d 904, 909 (5th Cir. 1975) (reiterating substantive due process test for determining the existence of excessive force). Under the substantive due process formulation of the excessive force claim, in determining the existence of excessive force, "a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent and injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), *cert. denied*, 414 U.S. 1033 (1974).

In *Tennesse v. Garner*, 471 U.S. 1 (1985), the Supreme Court began to weigh in against the use of a substantive due process test to determine claims of excessive force when such force was alegedly used in effectuating an arrest. In *Garner*, the plaintiff, the father of a child who was shot by police while fleeing, brought an action contending that the shooting of his son by the police constituted excessive force. The Court addressed the claim as a Fourth Amendment issue, stating that "[b]ecause one of the factors [in resolving the reasonableness of a seizure] is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." *Id*. at 8. However, in the wake of *Garner*, the Eleventh Circuit Court of Appeals continued to rely upon the substantive due process analysis in resolving excessive force claims involving the arrest or seizure of an individual. *See Popham v. City of Kennesaw*, 820 F.2d 1570, 1576 (11th Cir. 1987) (reciting substantive due process test for excessive force).

In *Graham v. Conner*, 490 U.S. 386, 393 (1989), the Court determined that the substantive due process standard was not implicated in all, or even most, cases of excessive force. In the case of the seizure of a suspect, for example, the Fourth Amendment ban on unreasonable seizures was, in light of *Tennessee v. Garner*, held to apply. *Id*. at 394-95.[3] In assessing whether an application of force against a suspect is reasonable, the Court noted to what features of the police action a court

---

[3] The Eighth Amendment, by contrast, governs the standards for excessive force with regard to post-trial incarcerated individuals. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The due process clause of the Fourteenth Amendment, rather than the search and seizure clause of the Fourth Amendment, continues to protect pre-trial detainees — i.e., those individuals arrested and being held for trial. *See McMillian v. Johnson*, 101 F.3d 1363, 1367 n.7 (1996) (J. Propst, specially concurring in denial of rehearing en banc). *But see Vineyard v. County of Murray, Ga.*, 990 F.2d 1207, 1210 (11th Cir. 1993) (refusing to decide whether claim of a pre-trial detainee arises under the Fourteenth Amendment due process clause or under Fourth Amendment), *cert. denied*, 510 U.S. 1024 (1993).

should attend:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. [*Tennessee v. Garner*, 471 U.S.] at 8 [], *quoting United States v. Place*, 462 U.S. 696, 703 [] (1983). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *See Terry v. Ohio*, 392 U.S., at 22-27 []. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 [] (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *See Tennessee v. Garner*, 471 U.S., at 8-9 [] (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *See Terry v. Ohio*, *supra*, 392 U.S., at 20-22 []. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, *Hill v. California*, 401 U.S. 797 [] (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, *Maryland v. Garrison*, 480 U.S. 79 [] (1987). With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick*, 481 F.2d, at 1033, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *See Scott v. United States*, 436 U.S. 128, 137-139 [](1978); *see also Terry v. Ohio*, *supra*, 392 U.S., at 21 [] (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. *See Scott v. United States*, *supra*, 436 U.S., at 138, 98 S.Ct., at 1723, *citing United States v. Robinson*, 414 U.S. 218 [] (1973).

*Graham v. Conner*, 490 U.S. at 396-97. "Of course, in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen." *Id.* at 399.

In the aftermath of *Graham*, the Eleventh Circuit Court of Appeals has developed a different

approach to excessive force claims than that pursued originally.[4] The approach developed is fact sensitive, examining whether any of the force used was necessary to effect the arrest and, of the force that was not, whether it was reasonable in light of the factors announced in *Graham*, i.e., "the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or fleeing." *Post v. Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994). This court undertakes this analysis in the light that the reasonable officer would have viewed the circumstances with which the actual officer was presented. *See id.*

The defendants in the instant action, claiming that the force utilized by Isbell was de minimis, seek to have this court conclude that the Fourth Amendment claim of the plaintiff is not viable. Three recent cases by the Eleventh Circuit Court of Appeals have impliedly, if not explicitly, utilized a de minimis force rule in denying excessive force claims. In *Post v. Fort Lauderdale*, 7 F.3d 1552, during an arrest of the plaintiff for an ostensible violation of the City's building code, an officer placed the plaintiff into a choke hold, handcuffed him and pushed him against a wall. The Court of Appeals found, citing *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986), as its basis for clearly established law *at the time of the alleged constitutional violation*, that the force used by the officer was not unreasonable because the amount of force used was minimal.[5] In *Gold v. City of Miami*, 121 F.3d at 1446, the police left handcuffs on the plaintiff too tightly for an extended period of time. Uncritically citing *Post*, the Court of Appeals determined that qualified immunity barred the claim of excessive force, because "the minor nature of this injury reflect[ed] that minimal force was used to apply the handcuffs." *Id.* Finally, in *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997), the police "'slammed' [the plaintiff] against [a] wall, kicked his legs apart, required him to raise his hands above his head, and pulled his wallet from his pants." The court found, again citing *Post*, that the force and injury used were minor in nature, permitting a finding that qualified immunity barred the damages claim. *Id.*

The de minimis rule, as expressed in these cases, is little more than a holdover from the Eleventh Circuit's pre-*Graham* caselaw. *Post* employed the substantive due process analysis of

---

[4] In fact, *Graham* did not result in an overnight change in the approach in the Eleventh Circuit to excessive force claims. *See Moore v. Gwinett County*, 967 F.2d 1495, 1498 (11th Cir. 1992) (applying substantive due process analysis to claim of excessive force where plaintiff was subjected to alleged force during an arrest).

[5]*Leslie* was a pre-*Graham* case under which the de minimis standard was employed.

excessive force in resolving the qualified immunity issue while it used the Fourth Amendment analysis with respect to the then-present state of constitutional law. Subsequent cases in the Eleventh Circuit have taken the de minimis discussion from *Post*, in which the court analyzed whether under pre-*Graham* case law the constitutional right at issue was clearly established, and applied it to the qualified immunity analysis in post-*Graham* cases. Nonetheless, the oversight embodied in the de minimis standard would be permanently ensconced as the incontrovertible law of the circuit, *see United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993), were it not that prior to *Post* and after *Graham*, the Eleventh Circuit Court of Appeals had already set forth the standard to be followed in post-*Graham* excessive force cases that did not employ the de minimis rule.[6] In *Ortega v. Schramm*, 922 F.2d at 695-96, a sheriff and his deputy forced their way into a gas station in which the plaintiffs were located by shooting off a door lock with a shotgun. While they searched the station, the plaintiffs were held at bay at gunpoint. Afterwards, two of the plaintiffs were walked out to the station parking lot at gunpoint, while one plaintiff, Ortega was dragged outside. Two other plaintiffs requested medical assistance for Ortega. Rather than calling for medical help, the police placed all three in handcuffs. Two of the plaintiffs suffered no injury at all. The court determined, *without reference to whether the force was minimal or not* (and, in light of the subsequent cases, it was clearly minimal), that the force used against *all of the plaintiffs* was unreasonable, with reference *only* to the factors set forth in *Graham*. *See id*. As the de minimis standard is not an element of a Fourth Amendment excessive force claim expressed in the earliest Eleventh Circuit case on the subject, the

---

[6] In *Walker v. Mortham*, 158 F.3d 1177, 1188-89 (11th Cir. 1998), the Eleventh Circuit Court of Appeals held that in deciding between conflicting precedents, a district (or circuit) court is to apply the earlier rule, in the absence of an intervening *en banc* decision of the Circuit Court of Appeals:

> We believe that the latter of these conflict rules — the "earliest case" rule — is the correct one, because of the importance of the prior precedent rule. The prior precedent rule, which binds later panels to the decisions of former panels, is essential to maintaining stability in the law. The rule is "emphatic" and "firmly established" in the Eleventh Circuit. *See Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir.1997); *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir.1993); *see also United States v. Steele*, 117 F.3d 1231 (11th Cir.1997) (following prior precedent despite explicit disagreement), *rev'd on other grounds, United States v. Steele*, 147 F.3d 1316 (11th Cir. 1998) (en banc). Of course, by adopting the "earliest case" rule to resolve intra-circuit splits, we are still in a sense ignoring the prior panel precedent rule--by choosing one line of cases, we are implicitly overruling the other line of cases. This is, however, a necessary consequence of an intra-circuit split, and the rule we adopt is more respectful of the prior panel precedent rule than the alternative "common sense and reason" rule, which essentially tells judges that once they find a division of authority they are free to throw precedent to the wind.

(Footnotes omitted).

court will refuse to apply that standard to the instant claim in determining the existence of a constitutional violation.

The plaintiff first asserts that, in the absence of probable cause to arrest the plaintiff, no amount of force used against the plaintiff could be reasonable. It is not correct that any use of force by an officer not premised on probable cause incident to an arrest is excessive: for example, an officer is expected occasionally to use some degree of force in effectuating a *Terry* stop premised on mere reasonable suspicion to believe that criminal activity "may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884-85, 20 L.Ed.2d 889 (1968). Alternatively, the application of limited force by an officer effectuating a mental health seizure is permitted, where there is "probable cause" to believe that commitment is necessary. *See Monday v. Oullette*, 118 F.3d 1099, 1102 (11th Cir. 1997). It is arguably the case that some degree of force can be used by an officer to restrain an injured individual in order to provide him or her with treatment.[7] Whether probable cause exists is a factor to be considered in evaluating the objective seriousness of the crime on which the use of force is premised and the objective threat posed by the plaintiff to himself or others; its absence, however, is highly indicative that any force used was unreasonable. *See Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998). In the instant action, Isbell was engaged in making an arrest of Nolin on the grounds that he had violated Alabama's disorderly conduct statute. In the present case, given that Isbell was attempting an arrest, if he lacked probable cause for making that arrest, he had no justification to utilize force against the plaintiff, as the determination of whether the plaintiff posed a threat or would resist arrest is largely premised on the contention that the plaintiff was likely engaged in disorderly conduct.

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.
> 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' *McCarthy v. De Armit*, 99 Pa. 63, 69, quoted with approval in the Carroll opinion. 267 U.S. at page 161 []. And this 'means less than evidence which would justify condemnation' or conviction, as Marshall, C.J., said for the Court more than a century ago in *Locke v. United States*, 7 Cranch 339, 348 []. Since Marshall's time, at any rate, it has come

---

[7] It is not clear whether considerations surrounding the use of force in the case of providing medical aid should impact the court's consideration of whether an absence of probable cause should make any application of force unreasonable, as the court is uncertain whether the application of excessive force in this sort of scenario is governed by the search and seizure clause Fourth Amendment or the due process clause of the Fourteenth Amendment.

> to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. *Carroll v. United States*, 267 U.S. 132, 162 [].

*Brinegar v. United States*, 338 U.S. 160, 166-67 (1949). The court notes that probable cause is "not [a] 'finely-tuned standard[],' comparable to the standards of proof beyond a reasonable doubt or of proof by a preponderance of the evidence," but rather is a "fluid concept[] that take[s] [its] substantive content from the particular contexts in which the standard[] [is] being assessed." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

> The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: "[T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman-Standard v. Swint*, 456 U.S. 273, 289, n. 19 [] (1982).

*Id.* at 696-97.[8]

The issue here is not whether the facts, as surmised by Nolin or Peede, would constitute disorderly conduct, even though mere unobtrusive horseplay is clearly not encompassed within the meaning of § 13A-11-7 of the Code of Alabama. The issue for the court to decide is whether, from the facts known by Isbell at the time of the arrest, an objectively reasonable police officer had sufficient information to justify the conclusion that the plaintiff was engaging in disorderly conduct — i.e., engaging "in fighting or in violent tumultuous or threatening behavior." There is no dispute that, from their vantage point inside of the café, Isbell, Black and Barret saw two men struggling atop

---

[8] The Eleventh Circuit Court of Appeals has recently made intonations about "arguable probable cause" being the standard in the qualified immunity context. As it is articulated — "whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed", *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (*see also Moore v. Gwinnett County*, 967 F.2d 1495, 1497 (11th Cir. 1992), *cert. denied*, 506 U.S. 1081 (1993) and *Swint v. City of Wadley, Alabama*, 51 F.3d 988 996 (11th Cir. 1995)). — the standard is entirely redundant of the actual test for probable cause, i.e., whether under the totality of the circumstances known to the officer a reasonable officer would suspect that wrongdoing has taken place. One could suppose that the Eleventh Circuit requires the court to determine whether a reasonable officer would find that a reasonable officer could find that criminal activity has or is occurring. Despite the fact that the formulation, once fleshed out, is nothing short of peculiar, it also becomes clear that what a reasonable officer would find permissible of another reasonable officer is nothing more than what a reasonable officer could find it himself or herself reasonable to do.

an automobile. They had heard someone yell "fight." The officers did not hear the adolescents laughing; they did not see the events leading up to the tussle. What the officers saw was a brawl. There was, therefore, a reasonable basis on which a reasonable officer could conclude that Nolin and Peede were fighting in violation of the disorderly conduct statute.

How Isbell behaved once he had probable cause to believe that Nolin and Peede were disorderly, and the manner in which he proceeded to arrest the plaintiff is more questionable. The plaintiff and Peede had ceased fighting. The offense of disorderly conduct, which Isbell had probable cause to suspect Nolin had committed, is a relatively minor one, a class C misdemeanor under Alabama law. Further, there was no indication that the plaintiff posed any threat to Isbell. Given Isbell's antagonism to "long-haired acid freaks," from Isbell's estimation a class into which the plaintiff fell, the court questions whether Isbell's stated belief that the plaintiff posed a threat is credible. Indeed, a reasonable trier of fact could conclude that, from the position of a reasonable officer, Nolin made no attempt to threaten anyone and did not pose a threat to the officer. Further, it is undisputed by the parties that the plaintiff made no attempt to resist Isbell's arrest of him. The court concludes that, in arresting the plaintiff, a reasonable trier of fact could conclude that Isbell violated the Fourth Amendment's protection against unreasonable searches and seizures.

## B. Qualified Immunity.

Isbell claims that he is protected by qualified immunity from suit from the plaintiff's claims of excessive force brought pursuant to § 1983. "Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lassiter v. Alabama A & M University*, 28 F.3d 1146, 1149 (11th Cir. 1994) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The immunity is not premised on the good faith or ill-will of the officer allegedly transgressing against the plaintiff's rights, but rather on whether, in light of prior law and the circumstances presented to the officer on the scene, a reasonable officer would have felt himself or herself free to act in the same manner as the defendant officer. *See Suissa v. Fulton County, Ga.*, 74 F.3d 266, 269 (11th Cir. 1996). Thus, qualified immunity absolves "all but the plainly incompetent or those who knowingly violate the law" from bearing the costs, both economic and political, of their actions. *Malley v. Briggs*, 475

U.S. 335, 341 (1986).

"When a defendant government official raises the defense of qualified immunity, first he must prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Suissa v. Fulton County, Ga.*, 74 F.3d at 269 (*quoting Sammons v. Taylor*, 967 F.2d 1533, 1539 (11th Cir. 1992). There is no indication that, at least insofar as federal qualified immunity is concerned, that the defendant was not acting within his discretionary authority.[9]

This court's inquiry must therefore focus on whether a reasonable officer would find that Isbell's acts violated clearly established law existing at the time of the alleged constitutional violation. "For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d at 1149 (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In making this determination, the court must focus on the specific contours of the right claimed, not its general manifestation. Absolute factual contiguity is not required. Nonetheless, "[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Fort Lauderdale*, 7 F.3d at 1557 (11th Cir. 1993). Thus, material similarity is necessary, but the court must not confuse the permissible determination of the contours of the right by reference to legally important factual similarities with an impermissible and mere requirement that the facts of the contested case and the facts of the "clearly established" case be read from the same page.

In resolving whether the defendant officer is entitled to qualified immunity from the plaintiff's claim of excessive force, this court must determine whether "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997). In *Ortega*, the defendant officers had reasonable suspicion, and perhaps probable cause, to believe that some criminal activity had taken place at the garage they were staking out. *See Ortegs v. Schramm*, 922 F.2d at 686. Nonetheless, it did not justify the defendant's

---

[9] The court notes that it is at least arguable that the answer to the question of whether an officer is acting within his discretionary powers at the time of the constitutional violation is a matter of state, rather, than federal law. The court has found no opinion from the Eleventh Circuit Court of Appeals addressing this matter and this court refuses to examine the matter at this time, as any resolution would not alter the outcome of this order.

breaking into the plaintiffs' garage and holding them at gunpoint, even though no harm resulted to the plaintiffs. *Id.* Here, the acts of Isbell fall clearly within the concerns of the Fourth Amendment. The plaintiff was no longer engaged in a fight and the officer made no initial attempt to determine whether the plaintiff was hostile. He simply and without warning threw the plaintiff headlong into a van. *See also Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998) (denying, where officer threw plaintiff against a soda machine and dragged her to patrol car, officer's qualified immunity argument on excessive force claim).

## C. Municipal liability.

The Supreme Court has placed strict limitations on municipal liability under section 1983. There is no respondeat superior liability making a municipality liable for the wrongful actions of its police officers in making a false arrest. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691 [] (1978). Instead, a municipality may be held liable for the actions of a police officer only when municipal "official policy" causes a constitutional violation. *See id.* at 694-95 []. [A plaintiff] must "identify a municipal 'policy' or 'custom' that caused [his] injury," *Board of County Com'rs v. Brown*, 520 U.S. 397, ----, 117 S.Ct. 1382, 1388 (1997) (*citing Monell*, 436 U.S. at 694, 98 S.Ct. 2018); "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 [] (1989).

*Gold v. City of Miami*, 151 F.3d 1346, 1349 (11th Cir. 1998). In addition to being liable where there is a stated written policy causing a constitutional violation, a municipality can be held liable where there is no explicit policy, but a custom of permissiveness with respect to the alleged violation exists, where the municipality is deliberately indifferent to the constitutional violations or where a final policymaker causes the constitutional malfeasance. The plaintiff here asserts that there exists two grounds on which a reasonable trier of fact could find municipal liability: First, argues the plaintiff, because Springville did not rid itself of Isbell or attempt to temper Isbell's ill-humor, even after he had received numerous complaints of excessive force, it was deliberately indifferent to such violations and should be held liable for Isbell's subsequent actions. Second, the plaintiff contends, because Black, the Chief of Police, refused to intercede in Isbell's actions, he abrogated a constitutional duty to intercede to prevent the use of excessive force from occurring and, as the final policymaker with regard to Springville's policing methods, Springville is liable for Black's constitutional dereliction.

To establish a "deliberate or conscious choice" or such "deliberate indifference," a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action. *See Board of County Com'rs v. Brown*, 520 U.S. 397, ---- - ----, 117 S.Ct. 1351 1382,

1390-91, (1997); *Young v. City of Augusta, Georgia,* 59 F.3d 1160, 1171-72 (11th Cir. 1995); *Church v. City of Huntsville,* 30 F.3d 1332, 1342-46 (11th Cir. 1994); *Wright v. Sheppard,* 919 F.2d 665, 674 (11th Cir. 1990); *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1556-57 (11th Cir. 1989). This Court repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise. For example, in *Wright v. Sheppard,* 919 F.2d 665 (11th Cir.1990), this Court held that a sheriff's department was not liable for a deputy's acts when "no evidence of a history of widespread prior abuse . . . put the sheriff on notice of the need for improved training or supervision." Id. at 674. Indeed, in *Church v. City of Huntsville,* 30 F.3d 1332 (11th Cir.1994), this Court reversed a district court's preliminary injunction against the City of Huntsville, holding that the plaintiffs were not likely to succeed on the merits of their failure- to-train claim without proof that the City was aware of a prior incident in which constitutional rights were similarly violated. *Id.* at 1342-46. *See also Popham v. City of Talladega,* 908 F.2d 1561, 1564-65 (11th Cir. 1990) (finding no liability for failure to train when no pattern of incidents put the City on notice of a need to train). More importantly, in *Brooks v. Scheib,* 813 F.2d 1191 (11th Cir. 1987), even though there had been ten citizen complaints about police officer Scheib, this Court held that the City did not have any notice of past police misconduct *because the plaintiff "never demonstrated that past complaints of police misconduct had any merit." Id.* at 1193. This Court aptly noted, "Indeed, the number of complaints bears no relation to their validity." *Id.*

*Gold v. City of Miami,* 151 F.3d at 1350 (emphasis added).

Although the policy manual of the police department of Springville explicitly prohibits the use of force except in unusual circumstances, the plaintiff apparently argues that the city failed to enforce that policy when Isbell had violated it in the past. Isbell, in deposition testimony, listed five suits against him, two of which this court determined from the court files, *Percy Moore v. Isabell,* 87-CV-133-M,[10] and *Engle v. Isbell,* 95-CV-489-M,[11] were settled, and another two that the court has not found, but as to which Isbell admits settlement — one brought by Roger Woodham for excessive force and another brought by Royce Doyle Gray for excessive force;[12] the court has discovered another suit, *Bailey v. Springville,* 86-CV-265-M, a civil rights claim of an unspecified sort which was subsequently dismissed.[13] Not simply the number, but the possible viability of these prior cases is of concern to this court. While most of these cases were settled and not resolved on the merits, the fact

---

[10] *Moore* involved an excessive force claim.

[11] *Engle* involved a claim that Isbell had used his position as a police officer to force sex upon the plaintiff.

[12] The events involving Woodham gave rise to a criminal case in which Isbell was acquitted. Isbell indicates that the fifth suit that he refers to, brought by Sarah Frost, may have been settled. Frost's claims included, according to Isbell, a claim for false arrest and perhaps a claim of excessive force.

[13] This case does not inform the court's analysis, except, perhaps, in favor of Isbell.

that the merit of such claims was never determined does not rob them of their significance in demonstrating that Springville knew of the existence of a possible problem, particularly when the majority of the complaints involve the same kind of constitutional violation, i.e., use of excessive force. Further, it is inappropriate that a municipality should skirt liability by continually settling its officers claims in order to avoid a record of neglect. The facts that such a large number of prior settled cases involving excessive force by Isbell exist, that the police department consisted of fewer than five individuals so that all members of the department would know of any claims against Isbell, that use of force training was apparently not required of Isbell after each of these events, and that no disciplinary action was taken against Isbell after each of these events evinces sufficient deliberate indifference on the part of Springville to excessive force claims against Isbell that a reasonable trier of fact could find Springville liable for Isbell's actions. *See Vann v. City of New York,* 72 F.3d 1040, 1049 (2$^d$ Cir. 1995)("An obvious need [for better supervision of an officer] may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.").

Plaintiff also attempts to hinge municipal liability on Black's failure to intercede in Isbell's use of force. An officer who sees and is capable of intervening in another officer's use of excessive force, has a duty to intervene. *See Ensley v. Soper,* 142 F.3d 1402, 1407 (11th Cit. 1998). However, the plaintiff has failed to demonstrate that Black saw, or even knew of, Isbell's alleged treatment of Nolin while it was occurring. As such Black can not be said to have violated any constitutional right and, regardless of his status as a final policymaker, Springville cannot be held liable for his actions.[14]

## II STATE LAW CLAIMS.

The plaintiff contends that in arresting him, Isbell committed the state-law torts of assault and battery, outrage, negligent use of force, negligent hiring, training and supervision of Isbell by Springville, abuse of process, false arrest and false imprisonment. The defendants argue that Isbell is entitled to discretionary function immunity for alleged state-law torts committed by him and that the

---

[14] The court notes that, in any case, the plaintiff is incapable of recovering punitive damages against the municipality for either the plaintiff's federal claims or his state-law claims. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981) and § 6-11-26 of the Code of Alabama of 1975.

plaintiff fails to state a claim against Isbell in any case. On behalf of Springville, the defendants assert that the town cannot be held liable for any of the torts committed by Isbell.

## A. Discretionary function immunity.

The defendants claim that Isbell is entitled to discretionary function immunity for his acts. Discretionary function immunity is the state-law equivalent of qualified immunity, giving an officer immunity from suit in those instances in which he is performing a discretionary function and a reasonable officer in his position would not have found his acts to be in contravention of clearly established state law. *See* Ala. Code § 6-5-338.

> If [the] acts [of a defendant] were discretionary acts, the burden shifts to the plaintiff to demonstrate that the defendants acted in bad faith, with malice or willfulness in order to deny them immunity. "Acts of such nature are not considered by Alabama law to be discretionary." *Wright v. Wynn*, 682 So.2d 1, 2 (Ala. 1996). Discretionary acts have been defined as "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Id.* at 2. *See also L.S.B. v. Howard*, 659 So.2d 43, 44 (Ala.1995).

*Sheth v. Webster*, 145 F.3d at 1238-39. "[A]n employee is not protected by discretionary function immunity if his actions were committed fraudulently, willfully, maliciously, or in bad faith." *Tuscaloosa County v. Henderson*, 699 So.2d 1274, 1278 (Ala. 1997). A reasonable trier of fact could find that the amount of force employed by the defendant was egregious and that some of Isbell's actions might have been precipitated and colored by Isbell's apparent disdain for "long-haired acid freaks" who needed to be run out of town, rather than by the apparent misdemeanor disorderly conduct of the plaintiff. Such facts point to malicious behavior by Isbell; defendants' motion for summary judgment on the plaintiff's state law claims against Isbell premised on discretionary function immunity will be denied. *See Sheth v. Webster*, 145 F.3d at 1239 (affirming denial of discretionary function immunity in case in which officer used excessive force against woman of Indian ethnicity about whom officer had expressed condescension).

## B. Viability of claims.

The defendants claim that the plaintiff cannot state his false arrest, false imprisonment, malicious abuse of process, outrage, assault and battery and negligence-type claims because Isbell had probable cause to arrest the plaintiff. The court will examine each of these claims in order.

**1. False arrest and imprisonment.**

The plaintiff claims that he was falsely arrested and imprisoned under Alabama law when he was arrested and when he was taken to the Ashville jail for processing even after probable cause had evaporated when it became clear that the plaintiff was not fighting with Peede. Under Alabama law, "[f]alse imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code § 6-5-170. "If there is a detention of the person by another, and that detention is unlawful, this will constitute false imprisonment." *Sokal Bros. Furniture Co. v. Gate*, 93 So. 724, 726, 208 Ala. 107 (Ala. 1922). Typically, where the false imprisonment claim involves the jailing of the plaintiff, the proof of false imprisonment will be co-extensive with proof of a false arrest claim. *See Drill Parts and Service Co. v. Joy Mfg.*, 619 So.2d 1280, 1284-85 (Ala. 1993) (analyzing the existence of plaintiff's false imprisonment claim by examining whether plaintiff's arrest was lawful under arrest statutes), and *Sokal Bros. Furniture Co. v. Gate*, 93 So. at 726-727 (treating plaintiff's entire claim to be one growing out of a false arrest that was not alleged in the complaint) & 727 (J. Gardner, dissenting, noting that while false imprisonment may be conditioned on an arrest, this is not always the case under Alabama law). Indeed, in the normal circumstance, the two claims are treated as one under Alabama law — as a claim that a plaintiff was arrested in his or her liberty without a warrant or probable cause. *Cf. United States Fidelity & Guar. Co. v. Kibbey*, 27 Ala.App. 45, 165 So. 600 (Ala. App. 1936). As the Alabama Supreme Court stated in *Upshaw v. McArdle*, 650 So.2d 875, 878 (Ala. 1994), "a wrongful or false arrest will also support a claim for false imprisonment."

The plaintiff's false arrest claim and his false imprisonment claim based upon the false arrest claim fail. To defeat a false arrest claim all that an officer is required to demonstrate is that he had probable cause for the arrest made. *See Upshaw v. McArdle*, 650 So.2d 875, 878 (Ala. 1994) and *Brooks v. City of Dothan Police Dept.*, 562 So.2d 162, 163(Ala. 1990). This court concluded, in determining the existence of excessive force, that Isbell had probable cause to arrest the plaintiff at the time the arrest was effectuated. Thus, any false arrest claim will be dismissed.

At the same time, not all false imprisonment claims involving the jailing of an individual are predicated on a false arrest of the individual. In *Hayes v. Mitchell*, 69 Ala. 452 (Ala. 1881), the plaintiff was arrested without warrant by the marshal of Oxford on the grounds that the plaintiff was about to commit a breach of the peace. The marshal then took the plaintiff into the local "caboose"

for two hours, until the mayor ordered the plaintiff released. The plaintiff then sued the marshal, which resulted in a judgment in the plaintiff's favor. On appeal, the Supreme Court of Alabama first noted that neither party contested the validity of the arrest. *Id.* at 454. The Court then remanded, not because a false imprisonment could not exist without an unlawful arrest, but because the jury failed to consider the circumstances possibly justifying the marshal's detention of the plaintiff. *Id.* at 455. The Court stated:

> Two great and vital principles of Government are to be kept steadily in view, in pronouncing on conduct, such as is brought to view in this record; the liberty of a citizen, and the peace and repose of society. Civil liberty is natural liberty, shorn of excesses which invade and trench on the equal liberty of others. No one can claim the right to violate the law, and precautionary force is justified, to prevent a greater impending evil. *Such force, however, is in its nature remedial, and can be carried no further than is reasonably necessary to prevent the threatened wrong.* Prevention is less hurtful than redress, and when prudently exercised, is not only justified, but is commended of the law. . . .
>
> The rule we declare in this case, must be applicable more or less to all municipalities; particularly to corporations having powers of local government. Possibly in cities and large towns, there is need of greater license in the matter of making arrests, and of detention, without warrant; but it culminates at last in the inquiry, what is reasonably demanded, to guard and protect the public peace. The time of day or night, the surrounding circumstances, the peaceful or riotus conduct of the public, the necessity real or apparent that the arresting officer shall be alert to prevent other acts of violence or lawless disturbance, the accessability of the mayor or other magistrate, all these enter into the inquiry, what is the duty of the arresting officer. . . . Let it be borne in mind, we are dealing with a case where the arrest is rendered lawful by the misconduct of the person arrested, and not with a case of causeless or wanton arrest. If the arrest in this case was without cause, of course no circumstances could justify the imprisonment.
>
> . . . The right to imprison was a question for the jury, under appropriate instructions. *There should certainly be no imprisonment, unless the circumstances rendered such imprisonment necessary.*

*Id.* at 454-55.

In *Simpson v. Boyd*, 101 So. 664, 665, 212 Ala. 14 (Ala. 1924), the jury was charged that "[b]efore you can find against the defendants for false imprisonment, you must be reasonably satisfied that at the time [the defendant] ordered the arrest of plaintiff, that he had no reasonable cause to believe that the plaintiff had committed a felony." The Supreme Court of Alabama held the charge in error, stating:

> [C]harge 6 was bad in instructing for the defendant if the original arrest was made in good faith, and unless Simpson had no reasonable cause to believe that the plaintiff was the man wanted in Chambers county. All of this may have been true when the arrest was made, but there was evidence from which the jury could infer that [the defendant] discovered the fact that the plaintiff was not the right man upon reaching Birmingham and subsequently took him to Chambers county and placed him in jail, and which could amount to false

> imprisonment notwithstanding the original arrest may have been made under the
> circumstances hypothesized in the charge.

*Id.* The court also notes the case of *Upshaw v. McArdle*, 650 So.2d 875, 879 (Ala. 1994), in which the
plaintiff raised a claim of false imprisonment against defendant McArdle on the grounds that after
discovering that there existed insufficient evidence to keep her in custody that he returned her to
custody for failing to sign a release from imprisonment. The Court, while it held that the plaintiff
had failed to put forward any evidence supporting her claim that McArdle had her returned to
custody after discovering her improper detention and therefore that her false imprisonment claim
failed, did not debunk the theory of the claim — i.e., that a continued detention of a person after
discovery that no basis for detention exists is unlawful and false.

In *Karrick v. Johnson*, 659 So.2d 77, 79 (Ala. 1995), the plaintiffs were arrested when they
attempted to refill a prescription that an officer had a reasonable basis to believe was doctored. The
plaintiffs challenged their subsequent imprisonment as unlawful. There was no claim made against
their detention subsequent to discovery that no charge could be stated against them. The Alabama
Supreme Court noted that because the plaintiffs were arrested under a valid warrant issued by a
warrant magistrate, "neither the arrest nor the subsequent imprisonment is considered 'false.'" *Id.*

While, there is no specific, on-point decision establishing the existence of a claim of false
imprisonment where a plaintiff is left in police custody beyond the time when evidence wholly and
clearly negating the existence of any crime comes into the hands of the police, the court opines that
precedent permits such a claim. Although after a complaint is filed against the plaintiff and he is
held for trial, the police no longer have the authority to effect the plaintiff's release, prior to that time,
an officer can liberate a suspect once he or she learns of facts that obviate the existence of any crime.
A reasonable trier of fact could conclude that promptly after arresting the plaintiff, Isbell was
confronted with facts indicating that Nolin and Peede were merely engaging in friendly
roughhousing not punishable under the disorderly conduct statute. As such, the plaintiff's false
imprisonment claim will remain.

The defendants sole argument against municipal liability for false imprisonment is that the
Supreme Court of Alabama has held that Springville cannot be held liable for Isbell's tortious
actions, citing *Brooks v. City of Birmingham*, 584 So.2d 451 (Ala. 1991). In making this argument,
the defendants have failed to be completely candid with the court. The holding on which the

defendants rely was clearly overruled in *Franklin v. City of Huntsville*, 670 So.2d 848 (Ala. 1995):

> This court affirms the holding of *Neighbors v. City of Birmingham*, 384 So.2d 113 (Ala. 1980)—that a municipality is immune from a malicious prosecution claim—but rejects the extension of *Neighbors* ro provide immunity to claims of false arrest and imprisonment brought under Ala. Code 1975, § 11-47-190. Any language to the contrary contained in . . . *Brooks v. City of Birmingham*, 584 So.2d 451 (Ala. 1991), is overruled.

*Id.* at 852. Such liability can exist where, as a reasonable trier of fact could find here, the liability against the municipal entity is premised on its "neglect, carelessness, or unskillfulness" of its officers due to inadequate training. *Id.*

## 2. Malicious prosecution/ abuse of process.

It is not clear whether in the instant action the plaintiff is alleging abuse of process, malicious prosecution, or both. "[A]n abuse of process . . . [is] distinguished from the action of malicious prosecution; the chief distinction being that the former rests upon the improper use of a regularly issued process, while the latter has reference to the wrong in the issuance thereof." *Clikos v. Long*, 165 So.2d 394, 395 (Ala. 1936). Regardless of which of these claims that plaintiff is advancing, it is due to be dismissed.

Under Alabama law, "malicious prosecution actions are not favored." *Skinner v. Etheridge*, 564 So.2d 902, 903 (Ala. 1990). "In order to prevail in an action for malicious prosecution, the complainant must prove each of the following elements of that cause of action: (1) a judicial proceeding initiated by the defendant, (2) a lack of probable cause, (3) malice, (4) termination of the judicial proceeding favorably to the plaintiff, and (5) damages." *Escoffier v. Anderson*, 557 So.2d 844, 845 (Ala. 1990). In the instant case, no proceeding was ever initiated against the plaintiff. The malicious prosecution claim will be dismissed.

Abuse of process is "perversion of a regular and valid process, which has been duly and properly issued, whereby a result not lawfully or properly attainable under it is secured." *Dempsey v. Denman*, 442 So.2d 63, 65 (Ala. 1983). "An abuse of process action 'presupposes an originally valid and regular process, duly and properly issued, and the validity of the process is no defense to an action for its abuse.'" *Warwick Development Co., Inc. v. GV Corp.*, 469 So.2d 1270, 1273 (Ala. 1985) (*quoting Farm Country Homes, Inc. v. Rigsby*, 404 So.2d 573, 576 (Ala.1981)). As with malicious prosecution, therefore, an abuse of process claim is premised on the initiation of an actual judicial proceeding. Again, as no such proceeding was ever instituted against the plaintiff, his claim fails.

### 3. Outrage.

The plaintiff claims that the acts of Isbell constituted outrageous conduct. To prove a claim of outrage, a plaintiff must show "(1) that the defendant's conduct was intentional or reckless; (2) that it was extreme and outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it." *Ex parte Crawford & Co.*, 693 So.2d 458, 460 (Ala. 1997). A claim of outrage can be permitted to proceed to a jury "only in egregious cases." *Id.* The plaintiff has claimed no more than that he was slightly embarrassed by the arrest and that he has some aversion to traveling into Springville, on the chance that he might encounter Isbell. The "distress" endured is not anguish and ennui bearable by only the most hard-hearted; the outrage claim will be dismissed.

### 4. Assault and Battery.

In *Wright v. Wright*, 654 So.2d 542, 544 (Ala. 1995), the Alabama Supreme Court stated:

> This Court has defined "assault" as
> "'an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'"
> *Allen v. Walker*, 569 So.2d 350, 351 (Ala.1990), *quoting Western Union Telegraph Co. v. Hill*, 25 Ala.App. 540, 542, 150 So. 709, 710, *cert. denied*, 227 Ala. 469, 150 So. 711 (1933), *as quoted in Holcombe v. Whitaker*, 294 Ala. 430, 435, 318 So.2d 289, 294 (1975). A successful assault becomes a battery, which consists of the touching of another in a hostile manner. *Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala.1986), *citing Singer Sewing Machine Co. v. Methvin*, 184 Ala. 554, 561, 63 So. 997, 1000 (1913).

The court cannot but conclude that Isbell's "touching" of the plaintiff was hostile. *Franklin v. City of Huntsville*, 670 So.2d at 851, provides for municipal liability where the officer committing the alleged assault or battery was unskilled as a consequence of inadequate training or supervision of the municipality. Summary judgment will be denied defendants with respect to this claim.[15]

---

[15] The court finds that the plaintiff's negligence and negligent supervision claims are bound up in these other torts in which the defendants allegedly engaged. This the court has discussion of them has been interspersed throughout its discussion of those claims.

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment will be GRANTED, in part, and DENIED, in part. The plaintiff's claims of false arrest, malicious prosecution/abuse of process and outrage will be DISMISSED, with prejudice. The remaining claims are as follows:

1. Excessive force in violation of the Fourth Amendment against both Isbell and Springville;

2. False imprisonment against both Isbell and Springville premised on the extended detention of Nolin; and

3. Assault and battery against both Isbell and Springville.

The plaintiff is not entitled to recover punitive damages from Springville.

DONE and ORDERED this 22Nd day of March 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE